UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE OUTLAW LABORATORIES, LP LITIGATION | Case No.: 3:18-cv-840-GPC-BGS (consolidated with 3:18-CV-1882-GPC-BGS)<br><br>**ORDER**<br><br>**(1) GRANTING IN PART AND DENYING IN PART OUTLAW'S MOTION TO DISMISS**<br><br>**(2) DENYING OUTLAW'S MOTION TO STRIKE** |

Before the Court are two motions.  The first is a motion by Plaintiff/Counterdefendant Outlaw Laboratory, LP ("Outlaw") to dismiss the counterclaims of Defendant/Counterclaimant Roma Mikha, Inc., and Third-Party Plaintiffs NMRM, Inc. and Skyline Market, Inc. (collectively, "Counterclaimants") (ECF No. 15.)[1]  The motion is fully briefed.  (*See* ECF Nos. 28, 33.)  The second is Outlaw's

---

[1]    This motion was originally docketed as ECF No. 15 to 18-CV-1882, a case that has since been consolidated with 18-CV-840.  For the purposes of this order, any reference to an ECF or docket entry shall be construed as referring to the docket for 18-CV-1882.

motion to strike Counterclaimants' third cause of action for rescission pursuant to California Code of Civil Procedure § 425.16.   This motion has similarly received the benefit of full adversarial briefing.  (*See* ECF Nos. 29, 32.)

Pursuant to Civil Local Rule 7.1(d)(1), the Court finds the matter suitable for adjudication without oral argument.  For the reasons explained below, Outlaw's motion to dismiss will **be granted in part and denied in part**; its motion to strike will be **denied** in full.

## I.    Factual Background and Procedural History

### A. Outlaw Laboratories LP

According to its pleadings, Outlaw is a Texas-based manufacturer of male-enhancement products called "TriSteel" and "TriSteel 8 hour."  Outlaw's products are made in the United States and distributed for sale in all 50 states, and are claimed to be in compliance with the Dietary Supplement Health and Education Act.  According to Counterclaimants, Outlaw was formed in Texas in September 2016.

### B. Outlaw's demand letters

Sometime starting in 2017 and continuing through 2018, Outlaw, through its attorneys at Tauler Smith LLP, began mailing demand letters to proprietors of gas stations, liquor stores, and corner stores in California, and beyond.  Those recipients allegedly sold male-enhancement pills designated by the word "Rhino," which Outlaw alleges contain undisclosed sildenafil, a prescription pharmaceutical regulated by the FDA.

Outlaw's demand letters warned recipients that they were "selling illegal sexual enhancement drugs," which "subject your company to legal action for racketeering . . . under RICO (Racketeer Influenced Corrupt Organizations) and the Federal Lanham Act" and obligate the recipients to pay to Outlaw "profits from the sale of Illicit Products dating back four years . . . Attorney's fees . . . Punitive damages . . . Triple damages . . . ."  The letter estimates the recipients' liabilities at "over $100,000" but states that Outlaw is "willing to settle all claims in exchange for a one-time settlement agreement [$9,765,

in the sample demand letter enclosed at ECF No. 4, Ex. A] and your agreement to stop selling the Illicit Products."

The letters conclude by warning that "[i]f this matter is not fully resolved before [a date typically within 30 days]," that a lawsuit will be filed against the recipient. Attached to the letters are three exhibits: (1) "photographs taken at your place of business capturing your sale of the Illicit Products," (2) "notices from the Food and Drug Administration regarding the illegality of the Illicit Products," and (3) a draft complaint with the recipient's name filled in as defendant.

Some recipients, like Third-Party Plaintiff Skyline Market, Inc., acquiesced to the demand letter and settled with Outlaw. Others, like defendants Roma Mikha, Inc., and NMRM, Inc., resisted.

### C. Outlaw files suit

True to its word, on July 24, 2018, Outlaw filed a complaint in San Diego Superior Court against a high volume of defendants, all of whom it had previously mailed a demand letter. (ECF No. 1-2, at 13 (Complaint).) Roma Mikha, Inc. was named in the complaint; NMRM, Inc., was not. Outlaw's complaint alleges that the defendants are engaged in a scheme to distribute and sell unlawful Rhino products.[2] It further claims that laboratory testing and public announcements by the Federal Drug Administration ("FDA"), have revealed that Rhino products contain hidden drug ingredients like sildenafil (a prescription drug found in Viagra), desmethyl carbodenafil (an analogue of sildenafil), dapoxetine (an anti-depressant drug), and tadalafil (a prescription drug found in Cialis).

Outlaw claims that, by selling the Rhino products at their stores, defendants disseminate the false statements on Rhino products stating that they are "all natural,"

---

[2] Outlaw's complaint implicates a range of Rhino products, including: Rhino 7 Platinum 5000, Rhino 12 Titanium 6000, Rhino 7 Platinum 3000, Rhino 8 Platinum 8000, Rhino 7 Blue 9000, Rhino 69 Platinum 9000, and Rhino 12 Titanium 6000.

contain "no harmful synthetic chemicals," "no prescription necessary," and have limited side effects. (*Id.* at 57.) Outlaw further asserts that the defendants' scheme has diverted sales away from its legitimate "TriSteel" male enhancement products, in violation of California Business and Profession Code § 17200 (prohibiting unlawful, unfair, or fraudulent business acts), § 17500 (prohibiting false and misleading advertising), and § 43(a)(1)(B) of the Lanham Act (prohibiting false advertising).

### D. Counterclaimants file their counterclaim

On August 12, 2018, Roma Mikha, Inc. removed the action to federal court. Thereafter, on August 24, 2018, Roma Mikha, Inc., NMRM, Inc., and Skyline Market, Inc. filed a Third Party Complaint (the "Cross-Complaint") against Outlaw. (ECF No. 4.) Their Cross-Complaint allege a class action against Outlaw for (1) civil RICO violation, 18 U.S.C. § 1962(c), (2) RICO conspiracy, 18 U.S.C. § 1962(d), and (3) rescission of any settlement agreements like the one entered into by Skyline Market.

With respect to the RICO counts, Counterclaimants allege a RICO enterprise between Outlaw, Tauler Smith LLP, and other as-yet-unnamed individuals, aimed at perfecting a legal "shakedown" of small-time San Diego convenience stores. (ECF No. 4, at 11.) They claim that the "TriSteel" products "were created as artifices" to "found the false advertising claims," and that Outlaw itself is no more than a front for the unlawful enterprise. (*Id.* at 14.)

Counterclaimants take especial umbrage with the demand letters sent by Outlaw, claiming that they were aimed at a "vulnerable community of victims," comprised of mostly "small, immigrant-run businesses." (*Id.* at 7, 11.) They urge that Outlaw's demand letters are not only manipulative, but also fraudulent, because Counterclaimants believe that the Rhino "products are not illegal to sell." (*Id.* at 12 (internal quotation marks omitted).) Sending those fraudulent letters through the U.S. Mails, therefore, constitutes mail fraud under 18 U.S.C. § 1341; committing mail fraud multiple times forms a pattern of racketeering under RICO. Counterclaimants further liken the conduct of Tauler Smith LLP to that of the Prenda Law Inc., and the Trevor Law Group, two law

firms that have become the posterchildren for abusive litigation.  *See Ingenuity 13 LLC v. John Doe*, No. 2:12-CV-8333-ODW (JCx), 2013 WL 1898633 (C.D. Cal. May 6, 2013) (describing, and then sanctioning, the coercive schemes of the Prenda Law Inc.); *People ex rel. Lockyer v. Brar*, 115 Cal. App. 4th 1315 (2004) (comparing the appellant's unsavory conduct to the actions of the Trevor Law Group).

Counterclaimants' second cause of action for RICO conspiracy is based on Outlaw's actions in conspiring "with the other as-yet-unnamed members of the Outlaw Enterprise." (ECF No 4, at 20.)  Counterclaimants' final request, for rescission of Skyline Market's "Confidential Settlement Agreement and Release" with Outlaw, and restitution of benefits conferred as a result thereof, is premised on their claim that Skyline Market had signed the agreement under duress, and that the contract was voidable as a result of Outlaw's scheme to defraud.  (*Id.* at 22.)  Couterclaimants further contend that Skyline Market's is not the only settlement agreement that must be rescinded; rather, all settlements entered into as a result of Outlaw's fraudulent demand letters must also be invalidated.

### E. Outlaw files a motion to dismiss and a motion to strike

In response, Outlaw moved to dismiss all claims asserted in the Cross-Complaint. It also has moved to strike the third cause of action for rescission pursuant to California's anti-SLAPP law.  The Court addresses these motions in turn.

## II.    Motion to Dismiss

### A. Rule 12(b)(6) Standard

A Rule 12(b)(6) motion attacks the complaint as not containing sufficient factual allegations to state a claim for relief.  "To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  In this respect, "[d]ismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory."

*Mendiondo v. Centinela Hosp Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008).

While "detailed factual allegations" are unnecessary, the complaint must allege more than "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678. "In sum, for a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009).

"Generally, a court may not consider material beyond the complaint in ruling on a Fed. R. Civ. P. 12(b)(6) motion." *Intri-Plex Techs., Inc. v. Crest Grp., Inc.*, 499 F.3d 1048, 1052 (9th Cir. 2007). However, "[a] court may take judicial notice of 'matters of public record' without converting a motion to dismiss into a motion for summary judgment," as long as the facts noticed are not "subject to reasonable dispute." *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001) (citation omitted); *see also United States v. Ritchie*, 342 F.3d 903, 908–09 (9th Cir. 2003).

### B. RICO and Mail Fraud Standards

RICO's private right of action is contained in 18 U.S.C. § 1964(c), which provides in relevant part that "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee." 18 U.S.C. § 1964(c).

Section 1962, in turn, prohibits "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). To recover under § 1962(c), a plaintiff must prove (1) conduct, (2) of an enterprise, (3) through a pattern, (4) of racketeering activity (known as "predicate acts"), (5) causing injury to the plaintiff's "business or property" by the conduct constituting the violation. *See Living Designs, Inc. v. E.I. Dupont de Numours & Co.*, 431 F.3d 353, 361

6

(9th Cir. 2005).

One type of predicate act of racketeering activity recognized by RICO, 18 U.S.C. § 1961(1) is mail fraud under 18 U.S.C. § 1341. A mail fraud violation consists of (1) the formation of a scheme or artifice to defraud; (2) use of the United States mails or causing a use of the United States mail in furtherance of the scheme; and (3) specific intent to deceive or defraud. *See Schreiber Distrib. Co. v. Serv-Well Furniture Co., Inc.*, 806 F.2d 1393, 1400 (9th Cir. 1986); *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 647 (2008) ("Mail fraud occurs whenever a person, "having devised or intending to devise any scheme or artifice to defraud," uses the mail "for the purpose of executing such scheme or artifice or attempting so to do." (quoting 18 U.S.C. § 1341)). The gravamen of the offense is the scheme to defraud, and any "mailing that is incident to an essential part of the scheme satisfies the mailing element," *Schmuck v. United States*, 489 U.S. 705, 712 (1989) (citation and internal quotation marks omitted), even if the mailing itself "contain[s] no false information," *id.* at 715.

### C. RICO Claims

Outlaw has moved to dismiss Counterclaimant's RICO-based causes of action on two grounds. First, it argues that that Counterclaimants have failed to identify a specific, materially false representation as would sustain their claim that Outlaw is engaged in the predicate acts of mail fraud. (ECF No. 15, at 10.) Second, it argues that the *Noerr-Pennington* doctrine, which immunizes those who petition the government for redress from statutory liability for petitioning conduct, shields it from RICO liability. (*Id.* at 13.)

### i. Sufficiency of Pleading Predicate Acts of Mail Fraud

Outlaw argues that Counterclaimants' RICO claims fail as a matter of law because Counterclaimants were required, and have failed, to "plead and prove that a defendant intended to defraud their victims using representations through the mail or wires that they knew to be materially false." (ECF No. 15, at 10.) Specifically, Outlaw contends that there was nothing false about their demand letter assertion that the Counterclaimants'

7

Rhino products are unlawful.[3]  Thus, according to Outlaw, Counterclaimants' failure to point to any materially false assertion in its demand letter dooms their RICO claims.  The Court disagrees and will not dismiss Counterclaimants' RICO claims on this basis.

Outlaw's argument—that a predicate act of mail fraud requires the allegation of a materially-false statement—is predicated on an incomplete reading of the Supreme Court's opinion in *United States v. Neder*, 527 U.S. 1 (1999).  There, the Supreme Court granted certiorari to "decide whether materiality is an element of a 'scheme or artifice to defraud' under the federal mail fraud, wire fraud, and bank fraud statutes." *Id.* at 20 (citations omitted).  After surveying the respective statutory texts, and concluding that Congress must be presumed to have used the term 'fraud' consistent with its common law understanding—i.e., one which required materiality, the Court uttered the sentence upon which Outlaw fixates: "Accordingly, we hold that materiality of falsehood is an element of the federal mail fraud, wire fraud, and bank fraud statutes." *Id.* at 23.

The careful reader would note, as did the Ninth Circuit in *United States v. Woods*, that *Neder* addressed only the requirement that "the scheme or artifice to defraud" be material.  *United States v. Woods*, 335 F.3d 993 (9th Cir. 2003).  *Neder* said nothing about whether a *mailing* issued to advance the scheme or artifice to defraud itself contain any material false statements, or that any false statement needed to be issued at any point during the scheme to defraud.  Instead, as the *Woods* court held, pre-*Neder* caselaw holding the contrary, is still good law after *Neder*:

> If a scheme is devised with the intent to defraud, and the mails are used in executing the scheme, *the fact that there is no misrepresentation of a single existing fact is immaterial*.  It is only necessary to prove that it is a scheme reasonably calculated to deceive, and that the mail service of the United States was used and intended to be used in the execution of the scheme.

---

3   Outlaw has asked the Court to take judicial notice a page of the FDA's website designating "sildenafil citrate" as a prescription drug.  (ECF No. 15-1.)  The Court will grant the request.  *See e.g., U.S. ex rel. Modglin v. DJO Glob. Inc.*, 48 F. Supp. 3d 1362, 1381–82 (C.D. Cal. 2014)*, aff'd sub nom. United States v. DJO Glob., Inc.*, 678 F. App'x 594 (9th Cir. 2017) (taking judicial notice of items proferred from the FDA website).

*Woods*, 335 F.3d at 998 (emphasis in original) (quoting *Lustiger v. United States*, 386 F.2d 132, at 138 (9th Cir. 1967)).

Indeed, a number of Ninth Circuit decisions post-*Neder* reaffirm this point. For example, in *United States v. Omer*, the Ninth Circuit rejected the defendant's "contention that *Neder* requires the allegation of a material false statement as an essential element of the offense." *United States v. Omer*, 395 F.3d 1087, 1089 (9th Cir. 2005). It held, instead, that "*Neder* does not go that far. It is the materiality of the scheme or artifice that must be alleged; the materiality of a specific statement need not be pleaded." *Id.* Similarly, in *United States v. Munoz*, the Ninth Circuit expressly stated: "Under the mail fraud statute the government is not required to prove any particular false statement was made. Rather, there are alternative routes to a mail fraud conviction, one being proof of a scheme or artifice to defraud, which may or may not involve any specific false statements." *United States v. Munoz*, 233 F.3d 1117, 1131 (9th Cir. 2002).

The district court's opinion in *Stillguamish Tribe of Indians v. Nelson* is precisely on point. There, the court confronted the same claim put forth by Counterdefendants— i.e., that a RICO claim predicated on mail fraud required a materially false statement in the mailing itself, and promptly rejected it. *Stillguamish Tribe of Indians v. Nelson*, No. C10-327 RAJ, 2012 WL 13028100, at *3 (W.D. Wash. July 24, 2012) (holding that defendant's argument that "wire and mail fraud require the communication itself employ a fraudulent device or scheme to defraud" was "squarely addressed and rejected by . . . *Woods*"). The Court breaks no new ground in following in the path of these decisions.

Counterclaimants are not required to allege that a particular false statement was either made within the demand letters, or without, to sustain a pleading for a scheme to defraud. Therefore, Outlaw cannot succeed on this aspect of its motion to dismiss.

### ii. *Noerr-Pennington* and the Sham Litigation Exception

Outlaw's second argument is that it is impervious to RICO liability under the *Noerr-Pennington* doctrine, and that the "sham litigation" exception to *Noerr-Pennington*

immutiy does not apply.

### a. The doctrine

The *Noerr-Pennington* doctrine derives from the First Amendment's guarantee of "the right of the people . . . to petition the Government for a redress of grievances." U.S. Const. amend. I. "Under the *Noerr-Pennington* doctrine, those who petition any department of the government for redress are generally immune from statutory liability for their petitioning conduct." *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 929 (9th Cir. 2006).

Although it originally arose in the anti-trust context, and with respect to the petitioning of the two political branches—i.e., the legislative and the executive—caselaw has significantly expanded the reach of the doctrine. Now, the "doctrine immunizes petitions directed at any branch of government, including the executive, legislative, judicial and administrative agencies." *Manistee Town Ctr. v. City of Glendale*, 227 F.3d 1090, 1092 (9th Cir. 2000) (citing *California Motor Trans. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972)). With respect to *Noerr-Pennington*'s application to the judiciary, the logic is that "lawsuits . . . are essentially petitions to the courts for redress of grievances." *Theofel v. Farey-Jones*, 359 F.3d 1066, 1078 (9th Cir. 2004).

In *Sosa*, the case upon which Outlaw primarily relies, the Ninth Circuit extended *Noerr-Pennington* to RICO actions predicated upon pre-suit demand letters. 437 F.3d at 942. The defendant in that case, DIRECTV, had "sent tens of thousands of demand letters alleging that the recipients had accessed DIRECTV's satellite television signal illegally and would be sued if they did not quickly settle DIRECTV's claims against them under the Federal Communications Act." 437 F.3d at 925–26. DIRECTV issued those letters after obtaining a list of individuals who had purchased smart card technology— technology that made it possible to, *inter alia*, gain unauthorized access to DIRECTV's signal—even though it possessed no "information on the uses to which these individuals were putting [the smart card] equipment." *Id.* at 926. In return, Sosa, one of the recipients, spearheaded a class action lawsuit against DIRECTV for mail and wire fraud under RICO. DIRECTV invoked *Noerr-Pennington*, and the Ninth Circuit found, as a

matter of first impression, that the doctrine applied.

The Ninth Circuit acknowledged that DIRECTV's "letters were not themselves petitions," but nonetheless afforded them First Amendment protection because "the Petition Clause may nevertheless preclude burdening them so as to preserve the breathing space required for the effective exercise of the rights it protects." *Id.* at 933. This proposition was not controversial, since a number of Ninth Circuit cases prior to *Sosa* had extended *Noerr-Pennington* to "conduct incidental to the prosecution of the suit," including the "decision to accept or reject an offer of settlement," *Columbia Pictures Indus., Inc. v. Prof'l Real Estate Investors, Inc.*, 944 F.2d 1525, 1528–29 (9th Cir. 1991) ("*PRE I*") *aff'd* 508 U.S. 49 (1993), and "discovery misconduct." *Freeman v. Lasky, Haas & Cohler*, 410 F.3d 1180, 1185 (9th Cir. 2005). To guard against any infringment of the First Amendment "breathing space" carved out by the seminal decision in *New York Times Co. v. Sullivan*, 376 U.S. 254, 272 (1964), the Ninth Circuit concluded that DIRECTV's demand letters, as chock-full of legal representations as they were, "c[ould not] support the mail and wire fraud predicates, even if DIRECTV intentionally misstated the law." 427 F.3d at 941.

### b. The sham litigation exception

At the same time, the Ninth Circuit noted a significant caveat to its holding, which Counterclaimants argue is relevant here: that is, "neither the Petition Clause nor the *Noerr-Pennington* doctrine protects sham petitions." *Id.* at 931. The so-called "sham litigation" exception removes from First Amendment protection any "baseless claims" asserted during or before litigation. *Id.* at 936; *see also Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 144 (1961) (holding that *Noerr-Pennington* immunity is not a shield for petitioning conduct that, although "ostensibly directed toward influencing governmental action, is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor").

The Ninth Circuit has consistently relied on two articulations of "sham litigation":

that set forth by the Supreme Court in *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.* 508 U.S. 49, (1993) ("*PRE II*"), and that detailed in its own decision in *Kottle v. Nw. Kidney Ctrs.*, 146 F.3d 1056, 1060 (9th Cir. 1998). In *PRE II*, the Supreme Court established a two-part test to determine whether a given litigation was a sham. First, the lawsuit must be "objectively baseless in the sense that no reasonable litigant could reasonably expect success on the merits." *PRE II*, 508 U.S. 60. Only if the challenged litigation is objectively baseless may the Court consider the second factor—i.e., the litigant's subjective motivation. *Id.* at 60–61. The question then is "whether the baseless lawsuit conceals an attempt to interfere directly with the business relationships of a competitor, through the use of the governmental process—as opposed to the outcome of that process—as an anticompetitive weapon." *Id.* at 61. The Ninth Circuit's decision in *Kottle* identified three circumstances in which the sham litigation exception might apply, the first of which mirrors the *PRE II* two-part test almost exactly.[4] *Kottle*, 146 F.3d at 1060.

---

[4] The three situations identified in *Kottle* are as follows:

First, if the alleged anticompetitive behavior consists of bringing a single sham lawsuit (or a small number of such suits), the antitrust plaintiff must demonstrate that the lawsuit was (1) objectively baseless, and (2) a concealed attempt to interfere with the plaintiff's business relationships.

Second, if the alleged anticompetitive behavior is the filing of a series of lawsuits, "the question is not whether any one of them has merit—some may turn out to, just as a matter of chance—but whether they are brought pursuant to a policy of starting legal proceedings without regard to the merits and for the purpose of injuring a market rival."

Finally, in the context of a judicial proceeding, if the alleged anticompetitive behavior consists of making intentional misrepresentations to the court, litigation can be deemed a sham if "a party's knowing fraud upon, or its intentional misrepresentations to, the court deprive the litigation of its legitimacy."

*Kottle*, 146 F.3d at 1060 (citations omitted). Because Counterclaimants did not engage in a *Kottle*-based discussion, it is difficult to ascertain which category of sham litigation it believes Outlaw is pursuing. To the best of the Court's understanding, the most likely candidate is situation one. To wit, there has not been a "series of lawsuits" against the Counterclaimants, nor does the Cross-Complaint expressly make any assertions that Outlaw has made intentional misrepresentations to the Court.

*Sosa*, however, did not decide "precisely how *PRE II*'s or *Kottle*'s definition of sham litigation applies to presuit demand letters in the RICO context." 427 F.3d at 938. This was for the simple reason that plaintiff had "declined to argue that the letters fall within the sham exception." *Id.*

Seizing on this language, Counterclaimants argue that "there is no specific authority describing how the sham exception should be applied in the context of alleged 'schemes to defraud' under RICO." (ECF No. 28, at 14.) Outlaw disagrees, contending that extant caselaw, such as the Supreme Court's decision in *PRE II*, provides ample guidance for what constitutes sham litigation.

The Court agrees with Outlaw. Although the *Sosa* court never engaged in an application of *Kottle* or *PRE II* to the facts of that case, nothing in *Sosa* indicates that the definitions set forth by the two cited cases would not be workable for determining the legitimacy *vel non* of a disputed litigation. On the contrary, *Sosa* favorably cited to at least two instances in which the Ninth Circuit applied *Kottle* and *PRE II* to "conduct incidental to the prosecution of the suit," the precise category that a demand letter, such as Outlaw's, would fall in. *See Sosa*, 427 F.3d at 938 (citing first *Theofel*, 359 F.3d at 1079 (sham litigation encompasses private subpoena issued in furtherance of discovery), then *Freeman*, 410 F.3d at 1185 (sham litigation includes sham "defensive pleadings")). Counterclaimants have provided no reason to avoid the definitions in *PRE II* and *Kottle*, and seeing no reason why they should not govern, the Court will apply them to the case at hand.

### c. Application

Thus, to sustain its claim that Outlaw's is a sham litigation, Counterclaimants must allege that the lawsuit was (1) objectively baseless, and (2) no more than a concealed attempt to interfere with the plaintiff's business relationships. *See Kottle*, 146 F.3d at 1060.

Because Counterclaimants' argument implicates *Noerr-Pennington*, the Court applies a heightened pleading standard. *See Oregon Nat. Res. Council v. Mohla*, 944

3:18-cv-840-GPC-BGS

F.2d 531, 533 (9th Cir. 1991) ("Where a claim involves the right to petition governmental bodies under *Noerr-Pennington* . . . we apply a heightened pleading standard.")  In this respect, Counterclaimants must satisfy more than the usual Rule 12(b)(6) standard.  Their Cross-Complaint "must include specific allegations of the specific activities" which bring Outlaw's conduct into one of the exceptions to *Noerr-Pennington* protection.  *Franchise Realty Interstate Corp. v. San Francisco Local Joint Exec. Board*, 542 F.2d 1076, 1082 (9th Cir. 1976).  "Conclusory allegations are not sufficient to strip [Outlaw's] activities of *Noerr-Pennington* protection."  *Mohla*, 944 F.2d at 533.

Unfortunately for Counterclaimants, they fall short at part one of the *PRE II/Kottle* analysis.  They must allege specific facts tending to show that Outlaw's suit is so "objectively baseless . . . that no reasonable litigant could reasonably expect success on the merits."  *PRE II*, 508 U.S. at 60.  Two allegations in Counterclaimants' Cross-Complaint bear on this point.  First, Counterclaimants allege that "any lawyer of ordinary skill knows that there is not even a colorable claim for RICO liability against [the Counterclaimants'] stores."  (ECF No. 4, at 12).  Second, they point out that while Outlaw had threatened a RICO suit in its demand letters, Outlaw elected not to include that cause of action in the complaint eventually filed.  (*Id*.)  They contend that Outlaw's shifting causes of action is proof that "the attorney members of the Outlaw Enterprise evidently recognized that stating RICO allegations to the Court would violate Rule 11." (*Id.*)

Counterclaimants' arguments are both too conclusory and too subjective to carry the day.  Their first argument—regarding what an ordinary lawyer might think with respect to a RICO claim against Counterclaimants—is a bare legal conclusion that does not withstand the heightened pleading standard applicable to *Noerr-Pennington* cases. *See Mohla*, 944 F.2d at 533.  Nor, for that matter, would it pass muster under ordinary Rule 12(b)(6) principles, which counsel the Court not to "assume the truth of legal conclusions merely because they are cast in the form of factual allegations."  *Western Min. Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981).

Moreover, Counterclaimant's second argument—as to what might be surmised from the conduct of Outlaw's attorneys at Tauler Smith LLP—is beside the point. The inquiry at part one is not whether Outlaw's attorneys subjectively believed that a RICO suit would have been frivolous. Rather, under both *PRE II* and *Kottle*, the issue is whether "an *objective litigant* could conclude that the suit is reasonably calculated to elicit a favorable outcome." *PRE II*, 508 U.S. at 60 (emphasis added). Counterclaimants have not adduced any indication that an objective litigant could not so conclude, except for their conclusory allegation that Outlaw's attorneys recognized that their submission of a RICO claim would run afoul of Rule 11. This is an unwinning factual assertion, because "an objectively reasonable effort to litigate cannot be sham regardless of subjective intent." *PRE II*, 508 U.S. at 57.

The Court recognizes that Counterclaimants have pointed to additional "indicia of sham litigation" in their opposition to Outlaw's motion to dismiss (ECF No. 28, at 14). Counterclaimants allege there that Outlaw did not have an internet presence until a few months before it started sending the demand letters, that the Outlaw enterprise "often serves the demand letter with no intention of following through with the threatened litigation where the victim merely ignores it," and that the enterprise "fails to pursue the litigation once filed." (*Id.* at 14–15.)

These allegations, however, do not matter for part one of the *PRE II*/*Kottle* analysis. Indeed, it is the second part of the sham litigation analysis which focuses on whether the party invoking *Noerr-Pennington* is impermissibly attempting to interfere with the other party "through the use of the governmental process—as opposed to the outcome of that process." *PRE II*, 508 U.S. at 61. Without demonstrating the objective baselessness of Outlaw's suit, however, Counterclaimants cannot proceed to the second part of the *PRE II/Kottle* analysis. *See id.* ("Only if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation.").

Because Counterclaimants have failed to meet their burden of pleading that Outlaw's lawsuit is objectively baseless, the Court will grant Outlaw's motion to dismiss

Counterclaimant's RICO claims. This dismissal applies both to the first RICO cause of action, 18 U.S.C. § 1962(c), and the second cause of action for RICO conspiracy, *id.* § 1962(d).

The Court notes that Counterclaimants might face some difficulty in proving the objective baselessness of Outlaw's suit in light of the material Outlaw has cited in its briefs, *see, e.g.*, *United States v. Donovan*, 539 F. App'x 648, 655 (6th Cir. 2013) (holding that evidence establishing defendant knowingly and intentionally agreed to distribute Viagra, among other substances, supported his conviction for RICO conspiracy), and proffered to the Court for judicial notice.[5] However, as Counterclaimants never squarely addressed themselves to the "objectively baseless" standard articulated in *PRE II/Kottle*, and because Counterclaimants might yet make their case, the Court declines to find leave to amend futile.

The dismissal shall be without prejudice and Counterclaimants are granted leave to amend.

### D. Rescission Claim

Outlaw has also moved to dismiss Skyline Market's[6] third cause of action for rescission[7] of its settlement agreement. Skyline Market claims two justifications for

---

[5] Outlaw's unopposed request for judicial notice, ECF No. 33-1, of the two Los Angeles Superior Court rulings in *Outlaw Laboratory, LP v. Lucky Liquor & Mini Mart, et al.* (Case No. SC129302) and *Outlaw Laboratory, LP v. Autobahn Fuels, Inc., et al.* (Case No. BC706471), and the U.S. Department of Justice Press Release dated February 17, 2016, entitled "Two Men Sentenced For Involvement in Scheme to Distribute Misbranded Drugs" is hereby granted.

[6] The Cross-Complaint refers to Skyline Market and "the other members of the class it seeks to represent"—i.e., those who settled with Outlaw after initially receiving a demand letter. (ECF No. 4, at 23–24.) For simplicity's sake, the Court will use Skyline Market as shorthand for both it and the putative class it seeks to represent.

[7] Both parties have expressly recognized that rescission is not a stand-alone cause of action under California law. While rescission is not an "'affirmative' claim," California courts have recognized that "claims such as 'economic duress' can be asserted offensively." *CrossTalk Prods. Inc. v. Jacobson*, 65 Cal. App. 4th 731, 845 (1998).

rescission: first, that it had "not know[n] that [its] agreement had been predicated upon a scheme to defraud that was illegal *ab initio*, as set forth above, and in Counts 1 and 2"— i.e., its RICO claims, and second, that it had signed the settlement agreement under the shadow of a $100,000 lawsuit and threat of duress.  (ECF No. 4, at 23–24.)  Outlaw contends that neither RICO nor economic duress can justify rescission.  (ECF No. 15, at 15–16.)

### i.  Rescission based on a scheme to defraud

Skyline Market's first argument—that Outlaw's "scheme to defraud" entitles it to rescission—rises and falls with its RICO-based mail fraud claims.  In other words, Skyline Market cannot invoke its RICO-based claims as a grounds for rescission because those claims have been dismissed on the basis of *Noerr-Pennington* immunity.  *See, e.g.*, *Vaughn v. Wells Fargo Bank, Nat'l Ass'n*, No. 17CV2365-LAB(BLM), 2018 WL 2387633, at *2 (S.D. Cal. May 25, 2018) (dismissing a claim because it is "derivative of the previous claims which the Court has determined do not state a claim upon which relief can be granted" (internal quotation marks and citations omitted)).

### ii.  Rescission based on economic duress

Skyline Market's second justification for rescission—economic duress—cannot be so easily dismissed.  "Under California law, economic duress can serve as a basis for rescinding a settlement agreement and/or release." *Tanner v. Kaiser Found. Health Plan, Inc.,* 2015 WL 7770216, at *3 (N.D. Cal. Dec. 3, 2015) (citing CAL. CIV. CODE § 1689(b)(1) (a party to a contract may rescind the contract if his or her consent was "obtained through duress, menace, fraud, or undue influence")).

Although, as Outlaw points out, early decisions by the California courts denied rescission based on the threat of litigation, or the incurring of fees, *see, e.g.*, *Sistrom v. Anderson*, 51 Cal. App. 2d 213, 221 (1942), *Hanford Gas & Power Co. v. City of Hanford*, 163 Cal. 108, 115 (1912), modern caselaw has dramatically transformed the doctrine of economic duress.  This is because courts, including California's, have developed an "increasing recognition of the law's role in correcting inequitable or

17

unequal exchanges between parties of disproportionate bargaining power and a greater willingness to not enforce agreements which were entered into under coercive circumstances." *Rich & Whillock, Inc. v. Ashton Dev., Inc.*, 157 Cal. App. 3d 1154, 1158 (1984) (citation and quotation marks omitted).

Today, economic duress no longer requires some "unlawful act in the nature of a tort or a crime" to trigger. *Id.* Instead, "the doctrine [of economic duress] . . . may come into play upon the doing of a wrongful act which is sufficiently coercive to cause a reasonably prudent person faced with no reasonable alternative to succumb to the perpetrator's pressure." *Id.* "Whether the party asserting economic duress had a reasonable alternative is determined by examining whether a reasonably prudent person would follow the alternative course, or whether a reasonably prudent person might submit." *CrossTalk Prod., Inc. v. Jacobson*, 65 Cal. App. 4th 631, 644 (1998). A reasonably prudent person "may have no reasonable alternative but to succumb when the only other alternative is bankruptcy or financial ruin." *Rich & Whillock*, 157 Cal. App. 4th at 1159.

In *Rich & Whillock*, the California Court of Appeals rescinded a settlement agreement on behalf of a fledgling sub-contractor who claimed that it had signed the agreement under economic duress. The sub-contractor was owed approximately $72,000 by the general contractor for work it performed in removing rock at a project site. However, the general contractor refused to pay the full amount, and instead insisted on a settlement agreement with a compromise payment of $50,000. The sub-contractor initially refused to sign, protesting that its new company would "go broke" if not paid the full amount, but eventually capitulated "after telling [the general contractor] that the agreement was 'blackmail' and he was signing it only because he had to in order to survive." *Id.* at 1157. The court found rescission appropriate because the general contractor had acted in bad faith in refusing to pay the sub-contractor its due, and were aware that the sub-contractor "was a new company overextended to creditors and subcontractors and faced with imminent bankruptcy if not paid its final billing." *Id.* at

1160.

Relying on *Rich & Whillock*, Counterclaimants argue that Skyline Market was similarly coerced. They claim that "[a]t the time Skyline Market signed the agreement, it did so under duress, given that it had been threatened with liability of 'over $100,000 if we prosecute this matter,' and was then presented with an offer to get out of that jam for a mere $2,800, or 2.8% of the asserted liability." (ECF No. 4, at 23.) They contend that they have sufficiently alleged a "wrongful act which is sufficiently coercive to cause a reasonably prudent [store] to succumb to the perpetrator's pressure." (ECF No. 28, at 17 (citing *Rich & Whillock*, 157 Cal. App. 3d at 1158).) In light of the nature and tone of the demand letters, and Counterclaimants' allegations that they were targeted because Outlaw knew that they were small operations run by immigrants for whom English is not their first language (ECF No. 4, at 2), the Court tends to agree.

Outlaw argues in reply that Counterclaimants should not be permitted to seek refuge under *Rich & Whillock* because the situations are factually dissimilar. (*See* ECF No. 33, at 9 ("The facts of all the cases cited by the Counter-Claimants in support of their rescission cause of action are all equally unhelpful and easily distinguishable from the present circumstances . . . .")) However, the fact that Counterclaimants' claim "does not fall within the four corners of . . . prior case law does not justify dismissal under Rule 12(b)(6)." *McGary v. City of Portland*, 386 F.3d 1259, 1270 (9th Cir. 2004). That Counterclaimants seek to apply the principles stated in *Rich & Whillock* to a new set of facts does not invalidate their bid to prove economic duress. *Id.* ("On the contrary, Rule 12(b)(6) dismissals are especially disfavored in cases where the complaint sets forth a novel legal theory." (citations and internal quotation marks omitted)). On the contrary, "because [Counterclaimants'] claim may be novel is reason itself not to dismiss it at this stage of the proceedings." *Brady v. Kuyper*, No. CIV S-06-2298-JAM-CMK, 2008 WL 2951199, at *3 (E.D. Cal. July 25, 2008), *report and recommendation adopted*, No. CIV S06-2298JAMCMK, 2008 WL 5381439 (E.D. Cal. Dec. 22, 2008).

Outlaw additionally contends that, rather than settling, Counterclaimants could

have availed themselves of the "reasonable alternative" of hiring an attorney to litigate the case.  (ECF No. 33, at 9.)  Their failure to do so, Outlaw argues, precludes their cry of economic duress.  The Court finds, however, that Outlaw has sufficiently pleaded that hiring an attorney was not a reasonable alternative.

Several of Counterclaimants' allegations (and the reasonable inferences therefrom) suggest why this was so.  First, in the demand letter sent to Skyline Market, Outlaw threatened to sue if its demand was not met within a two-week deadline.  (*See* ECF No. 4, at 26–27 (demand letter dated December 15, 2017 requiring a resolution by December 29, 2017).  The quick turn-around might have made it impracticable to hire an attorney to defend.  Even assuming an attorney was hired, however, a reasonable person in Skyline Market's position might nonetheless have felt powerless against the threat of $100,000 in liabilities.  Indeed, it is not unreasonable to assume that for at least some of recipients of that letter, a legal judgment for $100,000 would have amounted to "bankruptcy or financial ruin."  *Rich & Whillock*, 157 Cal. App. 4th at 1159.

It might be the case that Counterclaimants' bid for rescission will ultimately fail.  However, "courts have . . . recognized that the existence of economic duress raises a number of factual inquires that are ill-suited to resolution at the pleading stage."  *Advanced Cleanup Techs. Inc. v. BP Am. Inc.*, No. CV14-9033-CAS(AJWX), 2016 WL 67671, at *3 (C.D. Cal. Jan. 4, 2016).  The California Court of Appeals put it best when it issued the following statement:

> Whether the party asserting economic duress had a reasonable alternative is determined by examining whether a reasonably prudent person would follow the alternative course, or whether a reasonably prudent person might submit. Clearly this inquiry is a factual one, rarely if ever susceptible to determination on demurrer.[8]

*CrossTalk Prods.*, 65 Cal. App. 4th at 644.  As such, the Court denies Outlaw's motion to

---

[8]  *See Estate of Tucker ex rel. Tucker v. Interscope Records, Inc.*, 515 F.3d 1019, 1032 n.14 (9th Cir. 2008) (noting that a demurrer is the California equivalent to a Rule 12(b)(6) motion in federal court).

dismiss Counterclaimants' claim for rescission.

### III. Motion to Strike

Outlaw has additionally filed a special motion to strike Counterclaimants' third cause of action—rescission—pursuant to California Code of Civil Procedure § 425.16, typically referred to as the anti-SLAPP statute (ECF No. 16). In the event that it prevails, Outlaw seeks $3,778 in attorneys' fees for efforts spent litigating the anti-SLAPP motion (*id.* at 16). For the reasons articulated below, Outlaw's motion is **denied**.

#### A. The Anti-SLAPP Statute

"California passed its Anti-SLAPP statute in 1992 to address a spike in lawsuits aimed at chilling the exercise of the rights to free speech and to petition for redress of grievances." *Breazeale v. Victim Servs., Inc.*, 878 F.3d 759, 764 (9th Cir. 2017) (citing CAL. CIV. PROC. CODE § 425.16(a)). "SLAPP" stands for strategic lawsuits against public participation. *See Batzel v. Smith*, 333 F.3d 1018, 1023–24 (9th Cir. 2003). As a result, section 425.16 has come to be known as the "Anti-SLAPP statute." *Braun v. Chronicle Publishing Co.*, 52 Cal. App. 4th 1036, 1042 (1997).

The Anti-SLAPP statute provides that:

> A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim.

CAL. CIV. PROC. CODE § 425.16(b)(1).

California courts have crystalized around a two-part inquiry for assessing anti-SLAPP motions. *See Commonwealth Energy Corp. v. Investor Data Exchange, Inc.* 110 Cal. App. 4th 26, 31 (2003). At step one of the anti-SLAPP analysis, "the moving defendant must make a prima facie showing that the plaintiff's suit arises from an act in furtherance of the defendant's constitutional right to free speech." *Makaeff v. Trump Univ., LLC*, 715 F.3d 254, 261 (9th Cir. 2013). At step two, assuming that showing has

been made, the burden shifts to the plaintiff "to establish a reasonable probability that it will prevail on its claim[s]." *Id.*

### B. Discussion

Outlaw's motion to strike pertains only to Counterclaimants' claim for rescission.[9] Outlaw urges that its issuance of the demand letter to Skyline Market—i.e., the act which gave rise to Counterclaimants' rescission claim—was protected petitioning activity under the anti-SLAPP statute, and that Counterclaimants cannot demonstrate a reasonable probability that it would prevail on the merits. Outlaw, however, jumps the gun in delving straight into the two-step anti-SLAPP analysis. This is because rescission is not a cause of action within the meaning of the anti-SLAPP statute and therefore cannot be subject to a special motion to strike.

As noted by Counterclaimants, and as evidenced by the plain text of the anti-SLAPP statute, section 425.16 applies only to "causes of action." CAL. CIV. PROC. CODE § 425.16(b)(1) (specifying "[a] *cause of action* against a person . . . shall be subject to a special motion to strike" (emphasis added)). For the purposes of section 425.16, "[a] cause of action is comprised of a primary right of the plaintiff, a corresponding primary duty of the defendant, and a wrongful act by the defendant constituting a breach of that duty." *Marlin v. AIMCO Venezia, LLC*, 154 Cal. App. 4th 154, 162 (2007) (citations and quotation marks omitted). Remedies do not fall within the bounds of the definition stated in *Marlin*.

Indeed, California courts have declined to apply the anti-SLAPP statute to remedies. The California Court of Appeals had cause to address the issue in *Wong v. Jing*, 189 Cal. App. 4th 1354, 1360 n.2 (2010). There, plaintiff "purported to assert a

---

[9]  Anti-SLAPP motions may not be directed at federal question claims in federal court, like Counterclaimants' RICO claims. *See Globetrotter Software, Inc. v. Elan Computer Group. Inc.*, 63 F. Supp. 2d 1127, 1130 (N.D. Cal.1999) (the anti-SLAPP statute does not apply to federal question claims in federal court because such application would frustrate substantive federal rights); *In re Bah*, 321 B.R. 41, 46 (B.A.P. 9th Cir. 2005) ("We . . . agree with the *Globetrotter* court that the anti-SLAPP statute may not be applied to matters involving federal questions . . . .").

cause of action for 'specific performance/injunctive relief,'" which defendants sought to strike. Because plaintiff's claims for specific performance and injunctive relief were "equitable remedies and not causes of actions for injuries," and because the anti-SLAPP "statute applies only to 'causes of action,'" the court excluded those two claims from its anti-SLAPP analysis. *Id.* Similar rulings abound. *See, e.g.*, *Dep't of Fair Employment & Housing v. 1105 Alta Loma Road Apts., LLC*, 154 Cal. App. 4th 1273, 1281 n.3 (2007) (finding defendant's motion to strike "technically deficient" because it was aimed at "only the damages portion of the complaint," and because "damages are remedies, not causes of action or claims"); *Marlin*, 154 Cal. App. 4th at 162 ("An injunction is a remedy, not a cause of action. Accordingly, the SLAPP statute does not apply where it is the prayer for an injunction which arises from an act in furtherance of a person's right of petition or free speech.").

Rescission, like injunctive relief or damages, is not a cause of action. As the California courts have repeatedly held, "[r]escission is *not* a cause of action; it is a remedy." *Nakash v. Superior Ct.*, 196 Cal. App. 3d 59, 70 (1987); *see also Hailey v. California Physicians' Serv.*, 158 Cal. App. 4th 452, 468 (2007), *as modified on denial of reh'g* (Jan. 22, 2008) (holding that "rescission . . . is an equitable remedy"). Indeed, a court "does not rescind contracts but only affords *relief* based on a party's rescission." *Wong v. Stoler*, 237 Cal. App. 4th 1375, 1385–86 (2005), *as modified on denial of reh'g* (June 23, 2015). Outlaw has expressly acknowledged this distinction in its briefs. (*See e.g.*, ECF No. 15, at 15 (citing *Forever 21, Inc. v. Nat'l Stores Inc.*, No. 2:12-CV-10807-ODW, 2014 WL 722030, at *6 (C.D. Cal. Feb. 24, 2014) ("Rescission is a remedy and not a separate claim.")).

That Counterclaimants have somewhat inartfully labeled their request for rescission as a "third cause of action" does not bring them within the ambit of the anti-

SLAPP statute.[10]  The body of their rescission pleadings announce Skyline Market's intent to seek rescission, as enabled by California Civil Code § 1691, which provides that "the service of a pleading in an action or proceeding that seeks relief based on rescission shall be deemed to be . . . notice [of rescission]." (*See* ECF No. 4, at 23 ("Skyline Market hereby gives notice of its intention to rescind the 'Confidential Settlement Agreement and Release' that it entered with Outlaw Laboratory, LP, and accordingly rescinds that agreement.")).  Accordingly, the Court agrees with Counterclaimants that Skyline Market's notice of rescission and prayer for equitable relief are not causes of action to which the anti-SLAPP statute may apply.

In light of the foregoing, the Court will **deny** Outlaw's motion to strike and its request for related attorneys' fees.

## IV.     Conclusion

Consistent with the foregoing, the Court **denies in part** and **grants in part** Outlaw's motion to dismiss (ECF No. 15).  Counterclaimants are granted leave to amend their RICO claims to cure the deficiencies noted by the Court; if they wish to avail themselves of this opportunity, they must submit an amended counterclaim **within 30 days of this order**.  The Court further **denies** Outlaw's motion to strike Counterclaimants' claim for rescission in its entirety (ECF No. 16).  The motion hearing set for November 30, 2018 is **vacated**.

---

[10]     As Counterclaimants point out, *Forever 21*, the one case that might arguably run contra this conclusion—i.e., that rescission is not a cause of action for anti-SLAPP purposes—does not command a different holding.  2014 WL 722030.  There, National Stores, the party resisting the anti-SLAPP motion, alleged separate claims for "rescission" and "fraud," which Forever 21 sought to strike.  The district court noted that rescission was merely "a remedy" inseparable from the state-law fraud claim, and construed both claims together in its anti-SLAPP analysis.  *Id.* at *6.  It found that because National Stores could not demonstrate a reasonable probability of success on its fraud claim (pursuant to the second step of the analysis) there was accordingly "no basis for rescission," either.  *Id.* at *8.  Because the *Forever 21* court's analysis was predicated on the merits of National Store's fraud claim, the opinion cannot be read as endorsing rescission as an anti-SLAPP cause of action.

**IT IS SO ORDERED.**

Dated: November 27, 2018

Hon. Gonzalo P. Curiel
United States District Judge